IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TIFFANY A. ARENA,<br>on behalf of Plaintiff and the class members<br>described below,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>EAST LINE LENDING, LLC;<br>JENNIFER PETERS;<br>WOLF RIVER DEVELOPMENT COMPANY;<br>NEW PLATFORM FUND, LLC;<br>and JOHN DOES 1-20,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) DEMAND FOR TRIAL BY JURY<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT – CLASS ACTION

1.　　Plaintiff Tiffany A. Arena brings this action to secure redress from a predatory and unlawful loan (such as Exhibit A). The loans are made in the name of Defendant East Line Lending, LLC. Other parties involved in making the loans are Jennifer Peters, Wolf River Development Company, New Platform Fund, LLC, and John Does 1-20.

2.　　Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and RICO (Count II).

## JURISDICTION AND VENUE

3.　　The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367.  Jurisdiction may also exist under 28 U.S.C. § 1332(d).

4.　　This Court has personal jurisdiction over each Defendant because they knowingly participated in the making of unlawful loans to Indiana residents.

5.　　Venue is proper because acts to obtain and collect the loans impacted Plaintiff in the District.

## PARTIES

### Plaintiff

6. Plaintiff Tiffany A. Arena is a resident of Madison County, Indiana.

### Defendants

7. Defendant East Line Lending, LLC is an online lender that offers loans to consumers at annual percentage rates of more than 700%. (Exhibit A) It purports to be an entity formed under the laws of, and claims to be owned and controlled by, the Menominee Tribe of Wisconsin, a federally-recognized Indian Tribe. (Exhibit A, second page) It uses the address P. O. Box 958, Keshena, WI 54135. It also uses the address W2818 Warrington Road, Keshena, WI 54135.

8. East Line Lending, LLC operates through the website www.eastlinelending.com. The domain registry for the website is a nominee in Iceland (Exhibit B), which would not be necessary were it actually owned and controlled by the Menominee Tribe.

9. The fax number East Line Lending uses is 920-393-9460. (Exhibit C, p. 6 of 7) Keshena, Wisconsin is not within the 920 area code.

10. Defendant Jennifer Peters is the General Manager of the Wolf River Development Company, and describes her job as "to investigate, review, consider, pursue and conduct any non-gaming activity for the Menominee Indian Tribe." (Exhibit D)

11. Defendant Wolf River Development Company is an entity located at W2908 Tribal Office Loop Road, Keshena, WI 54135.

12. The activities of the Wolf River Development Company include high-interest loans. (Exhibit E)

13. Peters is also authorized to receive mail for Defendant New Platform Fund, LLC.

14. Defendant New Platform Fund, LLC is an entity which uses the addresses W2818 Warrington Road, Keshena, WI 54135 and P. O. Box 1017, Keshena, WI 54135.

15. Defendant New Platform Fund, LLC holds a security interest in all assets of East

Side Lending, LLC. (Exhibit F)

16. On information and belief, Defendant New Platform Fund, LLC funds the loans made by East Line Lending, LLC.

17. East Line Lending, LLC is one of multiple high-interest lending entities supposedly owned by the Menominee Indian Tribe. Others include Moose Lending, LLC; Elk Lending, LLC; Fox Lending, LLC d/b/a Loop Fund; and West Side Lending LLC.

18. All of these entities are operated by Wolf River Development Company through two subsidiaries, Four Directions Lending LLC and Five Clans Lending LLC. (Exhibits G-H)

19. New Platform Fund, LLC also holds a security interest in all assets of West Side Lending, LLC. (Exhibit I)

20. On information and belief, the economic benefit of the activities of East Line Lending, LLC is received by non-Native American persons.

21. East Line Lending, LLC does business in Indiana over the Internet, via text message, via Automated Clearing House transactions, and over the telephone.

22. Defendants John Does 1-20 are other natural and artificial persons involved in the lending activities described herein, such as the persons who use the fax number 920-393-9460 and the persons responsible for www.eastlinelending.com.

## FACTS RELATING TO PLAINTIFF

23. On or about March 15, 2022, Plaintiff took out an installment loan from East Line Lending, LLC. (Exhibit A) The loan had an amount financed of $1,500 and an annual percentage rate of 770.59%.

24. Plaintiff made some payments, with interest at the stated rate.

25. The loan was obtained for personal, family or household purposes and not for business purposes.

26. Exhibit A is written on a standard form loan agreement used by East Line Lending, LLC on a regular basis.

27. Defendants regularly make loans to individuals in Indiana at such rates.

28. The East Line Lending, LLC website lists states in which Defendants will not make loans. (Exhibit C, p. 5 of 7) Indiana is not one of these states.

29. Defendants seek out loans from residents of states other than those listed.

30. On information and belief, the list of states is primarily dependent on the likelihood of public or private enforcement in those states.

31. Defendants claim amounts are still owed on the loan.

## INDIANA REGULATION OF LENDING

32. The Indiana Uniform Consumer Credit Code establishes a maximum loan finance charge of 36% per annum for consumer loans.

33. Ind. Code § 24-4.5-3-201, dealing with loans other than supervised loans, provides:

(1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

34. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

Loan finance charge for supervised loans.

(1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.

(2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:

(a) the total of:

(i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;

(ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

>> (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or
>
> (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

35. The amount of finance charge provided for in <u>Exhibit A</u> greatly exceeds that permitted in Indiana on either unsupervised or supervised loans.

36. Ind. Code § 24-4.5-1-201, "Territorial application," provides:

> (1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .
>
>> (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.
>>
>> (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.
>>
>> (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.
>>
>> (f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.
>
> For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .
>
> (5) Notwithstanding other provisions of this section:
>
>> (a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence

5

applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

37. Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and **if the debtor has paid an excess charge the debtor has a right to a refund**. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) **If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award **reasonable attorney's fees** incurred by the debtor. . . . (Emphasis added)

38. Defendants are aware through prior litigation that their lending operations are

illegal.

## RENT-A-TRIBE SCHEMES

39. In an attempt to evade prosecution under usury laws of states like Indiana, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

40. In such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

41. The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

42. In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

43. However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

44. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

45. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

46. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

47. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

48. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

49. Telltale indicia of a "rent-a-tribe" scheme are the fact that telephone numbers and websites used by the lending scheme are identified with locations not connected with the tribe.

## SOVEREIGN IMMUNITY AS A DEFENSE TO STATE USURY LAWS

50. An entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

51. To determine if a particular entity is entitled to sovereign immunity, the majority

of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

52. An entity that "actually operates to enrich primarily persons outside the tribe or only a handful of tribal leaders" shows that it is not entitled to immunity. *People ex rel. Owen v. Miami Nation Enterprises*, 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016).

53. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

54. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

55. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

56. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United*

*States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

57. Plaintiff incorporates paragraphs 1-56.

58. Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff is entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

59. Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

60. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "East Line Lending" at more than 36% interest (all of its loans qualify) (c) where the last scheduled payment on the loan was on or after a date one year prior to the filing of this action.

61. Plaintiff may alter the class definition to conform to developments in the case and discovery.

62. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

63. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

64. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

65. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

66. Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

67. The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i. Statutory damages;

    ii. Attorney's fees, expenses and costs; and

    iii. Such other or further relief as is appropriate.

## COUNT II – RICO

68. Plaintiff incorporates paragraphs 1-56.

69. This claim is against Jennifer Peters, Wolf River Development Company, and New Platform Fund, LLC, who are the RICO "persons."

70. All loans made in the name of "East Line Lending" to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

71. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

72. "East Line Lending" is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

73. Defendants Jennifer Peters, Wolf River Development Company, and New Platform Fund, LLC, are each associated with this enterprise.

74. Defendants Jennifer Peters, Wolf River Development Company, and New Platform Fund, LLC, each conducted or participated in the conduct of the affairs of "East Line Lending" through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §

1962(c).

75. Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

76. Plaintiff brings this claim on behalf of a class.

77. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "East Line Lending" at more than 72% interest (all of its loans qualify) (c) where the loan was made on or after a date 4 years prior to the filing of suit.

78. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

79. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

    a. Whether the loans at issue are "unlawful debts" as defined in RICO.

    b. Whether "East Line Lending" is an "enterprise."

    c. Whether Defendants Jennifer Peters, Wolf River Development Company, and New Platform Fund, LLC, are each associated with "East Line Lending."

    d. Whether Defendants Jennifer Peters, Wolf River Development Company, and New Platform Fund, LLC, each conducted or participated in the affairs of "East Line Lending" through a pattern of making and collecting unlawful loans.

80. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

81. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

82. A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.      Individual actions are not economically feasible.

      b.      Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.      Treble damages;

      ii.      Attorney's fees, litigation expenses and costs of suit; and

      iii.      Such other or further relief as the Court deems proper.

*/s/Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **JURY DEMAND**

Plaintiff demands trial by jury.

*/s/Daniel A. Edelman*
Daniel A. Edelman

**NOTICE OF ASSIGNMENT**

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

/s/ *Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
**EDELMAN COMBS LATTURNER**
          **& GOODWIN, LLC**
20 S. Clark St., Suite 1500
Chicago, IL 60603
(312) 739-4200
(312) 739-0379 (FAX)

## DOCUMENT PRESERVATION DEMAND

  Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.


            */s/ Daniel A. Edelman*
            Daniel A. Edelman